## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

SHONTAE JENNINGS,

      Plaintiff,

v.                                       Case No. 13-10392

WAYNE COUNTY, SGT. MARK OSANTOWSKI,
CAPT. CHRISTOPHER GEORGE, and
DEPUTY CHIEF DENNIS RICHARDSON,

      Defendants.

_____/

### OPINION AND ORDER GRANTING IN PART, DENYING IN PART
### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pending before the court is a Motion for Summary Judgment filed by Defendants Wayne County, Sergeant Mark Osantowski, Captain Christopher George, and Deputy Chief Dennis Richardson on July 1, 2014.  (Dkt # 25.)  No hearing is necessary.  *See* E.D. Mich. LR 7.1(f)(2).  For the reasons stated below, the court will grant in part and deny in part Defendants' motion.

### I. BACKGROUND

This case stems from the employment of Plaintiff Shontae Jennings by Defendant Wayne County as a police officer for the Wayne County Sheriff's Department and her interactions with three of the Wayne County Sheriff Department's officers: Defendant Sergeant Mark Osantowski, Defendant Captain Chris George, and Defendant Deputy Chief Dennis Richardson. The parties do not agree on most of the facts that precipitated Plaintiff's complaint. Thus, as it must on a motion for summary

judgment, the court considers the facts of this case in a light most favorable to Plaintiff, the non-moving party.

On October 15, 2007, Plaintiff began her employment with the Wayne County Sheriff's Department. When she was hired, Plaintiff received a copy of Wayne County's sexual harassment policy, which included information on her right to file complaints with the Wayne County Sheriff's Department of Personnel and Human Resources. (Dkt # 25-4, Pg Id 325-26.) Plaintiff began working for the Narcotics Unit part-time in May 2008 and was appointed to the Narcotics Unit full-time in 2009. (Dkt # 27-2, Pg Id 607-08.)

In January 2010, Sgt. Osantowski became a supervisor in the Narcotics Unit. From January 2010 to August 2010, officers could receive an assignment from any sergeant in the unit. Plaintiff often worked with Sgt. Osantowski and other members of the Narcotics Unit in close quarters, including in the Narcotic Unit's undercover raid van. Plaintiff and Sgt. Osantowski had a "good working relationship in the beginning," and their relationship "included conversations about their personal lives." (Dkt # 27-2, Pg Id 632.)

Plaintiff contends that, beginning in February 2010, she experienced sexual harassment at the hands of, and had to work in a hostile work environment created by, Sgt. Osantowski. Between January 10, 2011 and May 6, 2011, Plaintiff kept a journal, extending to 12 pages, in which she documented her treatment in the Narcotics Unit, especially as it pertained to Sgt. Osantowski (the "Journal"). (Dkt # 27-2, Pg Id 628; Dkt

2

# 27-6, Pg Id 941.)  The Journal was "meant for personal knowledge based upon the situation with Sgt. Osantowski."  (Dkt # 27-2, Pg Id 627-28, 639.)

Plaintiff asserts Sgt. Osantowski made sexually explicit comments to her at least once or twice a week, telling her: (a) "I'm black from the waist down," and (b) that she should let Sgt. Osantowski "hit that [because] once you go this way, you ain't never going back" (which Plaintiff interpreted to mean have sexual intercourse with him).  (Dkt # 27-2, Page Id 632-34; Dkt # 27-3, Pg Id 773, 783.)  Plaintiff also asserts that Sgt. Osantowski told her that he could help promote her to the rank of sergeant if she acceded to his sexual demands.  (Dkt # 27-2, Pg Id 635.)  Plaintiff contends she rejected all of Sgt. Osantowski's advances and that caused him to "become more hostile in his approach to [Plaintiff]."  (Dkt # 27-2, Pg Id 634-36.)

Sgt. Osantowski also consistently made disparaging sexual comments about women in general.  He often referred to women as "bitches," spoke of their body parts or commented about having anal sex with them ("Yeah, I should just fuck that bitch in the ass and I'll tell her who's her daddy"), and he made lewd sexual comments on a daily basis.  (*See, e.g.*, Dkt # 27-2, Pg Id 634, 639; Dkt # 27-3, Pg Id 786-88; Dkt # 27-7, Pg Id 981-82, 1013, 1015-16, 1023; Dkt # 27-15, Pg Id 1528.)  Osantowski also told Plaintiff he could transfer women to his crew if he could "fuck" them and threatened to remove Plaintiff from the Narcotics Unit in favor of another female office with whom he wanted to have sex.  (Dkt # 27-3, Pg Id 750, 768; Dkt # 27-6, Pg Id 943.)  Many of these comments were made in front of his crew, all of whom were male (other than Plaintiff).  (Dkt # 27-2, Pg Id 634; Dkt # 27-6, Pg Id 943.)  The other members of Sgt.

3

Osantowski's crew also made degrading comments about women, calling them "bitches" and speaking openly about their sexual fetishes, all without any rebuke from Sgt. Osantowski. (Dkt # 27-2, Pg Id 639; Dkt # 27-3, Pg Id 786-88; Dkt # 27-7, Pg Id 981-82.) Sgt. Osantowski and Plaintiff's male co-workers ignored Plaintiff's requests that they stop making sexually demeaning remarks. (Dkt # 27-2, Pg Id 639.)

Plaintiff first brought a complaint regarding her working conditions in May 2010, when she told Capt. George that she "felt as though Sgt. Osantowski treats me differently because I'm a woman[.]" (Dkt # 27-2, Pg Id. 777; Dkt # 27-6, Pg Id 946.) Plaintiff contends Capt. George told her that he did not share her belief. (Dkt # 27-6, Pg Id 946.) Plaintiff represents that she brought similar complaints of differential and degrading treatment to Capt. George in June 2010, and he again told her that he did not "believe it to be so." (Dkt # 27-6, Pg Id 947.) In July 2010, Plaintiff told Sgt. Osantowski that she would make a formal complaint against him if he didn't change the way he treated her. (Dkt # 27-6, Pg Id 949.)

In August 2010, the Narcotics Unit was split into two teams: "Team Polo," run by Sgt. Osantowski, and "Team Puk," led by Sergeant Stefan Karpuk. (Dkt # 27-2, Pg Id 632.) Plaintiff was assigned to Team Puk in August 2010. (*Id.*) Although Plaintiff did not report directly to Sgt. Osantowski thereafter, she contends that Sgt. Ostatowski continued to harass her while she was assigned to Team Puk, as documented in her Journal. For example, Plaintiff claims that Sgt. Osantowski: (1) questioned her overtime, her work with Sgt. Karpuk on the ATF team, and her work with the Morality Unit,[1] and

---

[1] The "ATF team" was a group of Alcohol, Tobacco and Firearms officers assigned to Team Puk. The Morality Unit was another unit within the Wayne County Sheriff's Department that

(2) denied her overtime and training opportunities, which he allegedly saved for the officers on Team Polo.  (Dkt # 27-2, Pg Id 642; Dkt # 27-6, Pg Id 950-54.)

In November 2010, Plaintiff met with Capt. George, Deputy Chief Richardson, and others for the purpose of expressing that she was tired of Sgt. Osantowski sexually propositioning her, making lewd comments to and about her, and calling her a "bitch." (Dkt # 27-3, Pg Id 771, 777; Dkt # 27-6, Pg Id 951; Dkt # 27- 10, Pg Id 1444, 1446.)  As a result, Deputy Chief Richardson spoke to Wayne County legal counsel Ursula Henry and reported that Plaintiff was making complaints of a sexual nature about a supervisor. Plaintiff claims that notwithstanding Ms. Henry's advising that he had to investigate Plaintiff's complaints whether or not she filed a formal complaint, Deputy Chief Richardson failed to document her complaints, conduct an investigation regarding those complaints, or refer them up the chain of command, all of which contravened Wayne County's sexual harassment policy.  (Dkt # 27-9, Pg Id 1394, 1398; Dkt # 27-11, Pg Id 1459; Dkt # 27-12, Pg Id 1477-81; Dkt # 27-13, Pg Id 1502.)  Deputy Chief Richardson did provide Plaintiff with the phone number to the Michigan Department of Civil Rights ("MDCR") that Ms. Henry had given him.  (Dkt # 27-2, Pg Id 645; Dkt # 27-9, Pg Id 1394; Dkt 27-10, Pg Id 1444.)

Deputy Chief Richardson preferred that Plaintiff not make a formal complaint. (Dkt # 27-9, Pg Id 1400-02.**)** Deputy Chief Richardson believed an "investigation would damage the unit" because "[i]t would create the dissension and the poor working atmosphere" that ultimately permeated the Narcotics Unit by the end of July 2011.  (*Id.*

_____

often worked with the Narcotics Unit.

5

at 1394, 1401-02.)  Plaintiff also claims that Deputy Chief Richardson told her that she would have to be transferred out of the Narcotics Unit if she filed a formal sexual harassment complaint against Sgt. Osantowski.  (Dkt # 27-2, Pg Id 643, 645; Dkt # 27-6, Pg Id 951.)  Deputy Chief Richardson admits that he told Sgt. Osantowski about Plaintiff's complaints and that he took no corrective action against Sgt. Osantowski.  (Dkt # 27-9, Pg Id 1398-1400.)  Plaintiff claims` that Sgt. Osantowski continued to harass her after she met with Deputy Chief Richardson.

Plaintiff met with Deputy Chief Richardson, Capt. George, Capt. Kahl Sabbaugh, and Sgt. Karpuk on January 10, 2011,[2] "as a final attempt to address the ongoing sexual harassment and the hostile working environment in which [Plaintiff] was struggling to perform [her] duties at [that] time.  The command staff was notified, again, of Sgt. Osantowski's unwanted and vulgar advances, along with his hostile behavior towards [Plaintiff] upon rejecting his propositions and his constant reminder that he would have [her] transferred from the unit if [she] did not comply."  (Dkt # 27-14, Pg Id 1505.)  Plaintiff claims that Defendants failed to document or investigate her complaints or take any corrective action after this meeting, and maintains that Deputy Chief Richardson again told her that she would be transferred from the Narcotics Unit if she filed a formal complaint.  (Dkt # 27-2, Pg Id 646; Dkt # 27-14, Pg Id 1505.)  Plaintiff asserts that both Sgt. Osantowski and Deputy Chief Richardson started treating her

---

[2]Plaintiff has submitted evidence that there were two meetings with a number of supervisors, one in November 2010 and one on January 10, 2011.  In looking at the evidence in the record, the court notes that Plaintiff's descriptions of the meetings and the events that transpired after them are very similar, if not identical.  Nonetheless, Plaintiff claims that there were two meetings. *See* Dkt # 27-2, Pg Id 646.

6

differently after this meeting, including a general refusal to provide her with back-up on drug raids.  (Dkt # 27-6, Pg Id 952-53.)  Plaintiff asserts this "terrified" her and made her "second guess" her decisions all the time.  (Dkt # 27-2, Pg Id 640-41.) Plaintiff states that she continued to be treated differently by both of them, as she was denied overtime and comp time and Sgt. Osantowski continued reviewing her timecards, even though she was not under his direct command.  (Dkt # 27-2, Pg Id 642; Dkt # 27-6, Pg Id 952-55; Dkt # 27-5, Pg Id 899.)

Sgt. Karpuk told Capt. George in March 2011 that Sgt. Osantowski needed to "quit fucking with [Plaintiff]."  (Dkt # 27-5, Pg Id 899.)  Sgt. Karpuk described the situation as follows: "Well, it makes sense if [Sgt. Osantowski] feels scorned and everybody knows that [Sgt. Osantowski] is a womanizer . . . Man this is classic.  You were scorned and now you're fucking with this girl." *Id.*  Plaintiff asserts the harassment continued despite Sgt. Karpuk's warnings.  Plaintiff met with Capt. George in April 2011 to again complain about Sgt. Osantowski's sexual harassment and retaliation.  (Dkt # 27-15.)  Capt. George did not document or investigate any of Plaintiff's claims raised at that meeting.  (*See, e.g.*, Dkt 27-17, Pg Id 1597.)  In addition, Plaintiff believed that Sgt. Osantowski had been and was continuing to "taking money out of her check" by not approving payment for her comp time and/or not giving her comp time.  (Dkt # 27-2, Pg Id 647-48.)

According to Plaintiff, in May 2011, in an unrelated matter, Deputy Chief Richardson stated, "I'm the most vindictive motherfucker you ever want to meet."  (Dkt # 27-14, Pg Id 1506.)  Sgt. Karpuk concurred in that assessment, as he told Undersheriff

7

Pfannes that Deputy Chief "Richardson, respectfully, is a tyrant.  He's a vindictive man that is set in his 1970s way of doing police work."  (Dkt # 27-5, Pg Id 897.)

On May 6, 2011, Plaintiff made a written complaint to Captain Alan Bulifant of the Wayne County Sheriff Department's Internal Affairs ("IA") unit.  On May 10, 2011, Plaintiff met with Undersheriff Daniel Pfannes, Chief Raphael Washington and Wayne County Sheriff Department's counsel Darnella Williams, at which time Plaintiff was informed that Undersheriff Pfannes was going to investigate her complaint.  On May 11, 2011, Sgt. Osantowski was transferred from the Narcotics Unit to the Wayne County jail, and Plaintiff had no interaction with Sgt. Osantowski after that day.  Undersheriff Pfannes completed the investigation of Plaintiff's complaint in August 2011, ultimately preparing a 73-page investigation report (the "Report").  (*See* Dkt # 27-17.)

In the Report, Undersheriff Pfannes confirmed many of Plaintiff's claims, including that: (a) Sgt. Osantowski said he was "black from the waist down," in an apparent reference to the size of his penis; (b) Sgt. Osantowski engaged in sexual conversations with subordinates while Plaintiff was present; (c) Sgt. Osantowski was constantly threatening to transfer Plaintiff; (d) Sgt. Osantowski overly scrutinized Plaintiff; and (e) Plaintiff was treated differently than other officers.  (Dkt # 27-17, Pg Id 1596-97.)  Undersheriff Pfannes also concluded that: (1) Cpt. George "provided a number of untruthful answers to questions that were posed to him [about] whether or not [Plaintiff] had ever told him of the allegation that Sergeant Osantowski had engaged her in a discussion of a sexual nature, whereby, he asked her if she thought the two of them were ever going to have intercourse together," and (2) "[b]ased on the facts and

8

information [from the investigation], it has been clearly established that numerous policies and directives of the Wayne County Sheriff's Office have been violated," particularly as it related to the manner in which the complaints made by [Plaintiff] were handled." (*Id.* at 1597-98.)  As a result of the investigation, Sgt. Osantowski received a 12-day suspension, Capt. George received a one-day suspension, and Deputy Chief Richardson received a one-day suspension.

Plaintiff asserts that even after Sgt. Osantowski was transferred, she was subjected to degrading vulgarities from male officers in the Narcotics Unit.  (Dkt # 27-2, Pg Id 639; Dkt 27-18, Pg Id 1674.)  Plaintiff also asserts that Deputy Chief Richardson continued to retaliate against her after the IA investigation was commenced (and completed). Deputy Chief Richardson allegedly: (1) deprived her of overtime opportunities offered to her male counterparts, (2) banned her from going to the prosecutor's office to process warrants, (3) refused Plaintiff's request to attend advanced training sessions that her coworkers attended, (4) held briefings without her and caused her coworkers "not to speak to [her] and treat [her] disrespectfully," (5) banned her from going to the ATF Detroit Field Office, even though she worked for ATF, (6) refused to sign her DEA taskforce agreement, (7) demanded her Blackberry even though co-workers go to keep theirs, and (8) ignored her calls during raids.  (Dkt # 27-2, Pg Id 642-43; Dkt # 27-14, Pg Id 1506-11.)  There is no evidence that, prior to June 14, 2012, Plaintiff complained to anyone at the Wayne County Sheriff's Department or anyone associated with Wayne County about the alleged degrading vulgarities by male

officers (other than Sgt. Osantowski) or the alleged retaliation by Deputy Chief Richardson.

On June 14, 2012, Plaintiff filed a Charge of Discrimination with the MDCR and the Equal Employment Opportunity Commission ("EEOC").  (Dkt # 27-19, Pg Id 1677 (MDCR); Dkt # 27-21, Pg Id 1681 (EEOC).)  Therein, Plaintiff claimed she had been subjected to sexual harassment and had been retaliated against for engaging in protected activity.  Effective on or about October 1, 2012, Defendants transferred Plaintiff and several other officers from the Narcotics Unit to the Wayne County jail. Defendants maintain that the transfers were made because specialty units such as the Narcotics Unit and Morality Unit lost funding from Wayne County.  (Dkt # 25-10, Pg Id 12.)  Plaintiff states that Capt. George informed her on October 5, 2012, that she would be transferred from the Narcotics Unit to the Wayne County jail, effective immediately. (Dkt # 27-14, Pg Id 1511.)  According to Deputy Chief Richardson, Plaintiff was one of many officers in the Narcotics Unit who was transferred out of the Narcotics Unit based on a list that he and Department Chief of Operations Raphael Washington had previously put together.  (Dkt # 27-10, Pg Id 1437-39.)  Not all officers in the Narcotics Unit, however, were transferred.  (*Id.* at 1438.)  Deputy Chief Richardson asserts that the basis for transferring an officer from the Narcotics Unit to the Wayne County jail was the officer's salary and/or the fact that the officer was a member of the command staff. (*Id.* at 11438-39.)  Plaintiff was not a member of the command staff, and Deputy Chief Richardson testified that he couldn't recall "how she got on that particular list" of officers to transfer.  (*Id.* at 1439.)

10

On November 27, 2012, Plaintiff filed a second Charge of Discrimination with the MDCR and EEOC for the alleged retaliatory act of transferring Plaintiff from the Narcotics Unit to the Wayne County jail.  (Dkt # 27-20, Pg Id 1679 (MDCR); Dkt # 27-21, Pg Id 1681 (EEOC).)  On November 5, 2013, Plaintiff received a Notice of Right to Sue letter from the United States Department of Justice.  (Dkt # 27-21, Pg Id 1681.)

On December 4, 2013, Plaintiff filed her first amended complaint.  (Dkt #14.)  In her first amended complaint, Plaintiff alleged that Defendants violated her: (a) rights under Title VII of the Civil Rights Act under the theories of *quid pro quo* harassment and creating a hostile work environment because they subjected Plaintiff to unwelcome sexual harassment (Count I); (b) rights under Title VII by retaliating against Plaintiff for complaining about the sexual harassment she was experiencing, *e.g.*, by denying overtime, training opportunities, and eventually transferring her to the Wayne County jail (Count II); and (c) First Amendment Free Speech rights (Count III).  Plaintiff has since withdrawn, and agreed to dismiss with prejudice, the *quid pro quo* component of her sexual harassment claim in Count I.  (Dkt # 27, Pg Id 574.)

**II. STANDARD**

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Thompson v. Ashe*, 250 F.3d 399, 405 (6th Cir. 2001). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, and all inferences should be made in

favor of the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party discharges its burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325).

Once the moving party has met its burden of production, the burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citing Fed. R. Civ. P. 56(e)). "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### III. DISCUSSION

### A. Timeliness of Title VII Claims

For Title VII claims, the applicable statute of limitations begins to run from the date of the "alleged unlawful employment practice" and affords a claimant up to 300 days from that date to file a claim of discrimination with the EEOC. *See* 42 U.S.C. § 2000e-5(e)(1). As Plaintiff filed her first discrimination charge with the EEOC on June 14, 2012, Defendants assert that "any alleged unlawful discrimination must have

12

occurred between August 19, 2011, and June 14, 2012." Defendants argue that, except for the alleged missed overtime and training opportunities occurring after August 19, 2011 and Plaintiff's transfer to the Wayne County jail in October 2012, "all other claims of harassment and retaliation are time-barred because they fall outside the statute of limitations period."

Plaintiff argues that none of her Title VII claims are time-barred because either: (1) the events occurred after August 19, 2011 (*e.g.*,her transfer to the Wayne County jail, missed overtime and training opportunities, and sexual comments degrading to women made by other officers), or (2) for events occurring prior to August 19, 2011, the continuing violations doctrine applies because the hostile work environment to which she was subjected constituted a single "unlawful employment practice." *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) ("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The 'unlawful employment practice' therefore cannot be said to occur on any particular day."). Defendants counter that any acts that occurred after August 19, 2011, were "discrete" and, as such, do not trigger the continuing violations doctrine.

In *Morgan*, the Supreme Court held that hostile work environment claims will not be time barred, "so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Id.* at 122. A hostile work environment claim lies "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working

13

environment[.]" *Id.* at 116 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21

(1993). The *Morgan* court distinguished hostile work environment claims from claims

based on discrete acts, recognizing that:

> Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice."

*Id.* at 114. On the other hand,

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. . . . The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. . . . Such claims are based on the cumulative effect of the individual acts.

*Id.* at 115 (citations omitted). The *Morgan* court further stated:

> A hostile work environment claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1). The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile work environment may be considered by a court for the purposes of determining liability.
>
> That act need not, however, be the last act. As long as the employer has engaged in enough activity to make out an actionable hostile environment claim, an unlawful employment practice has "occurred," even if it is still occurring. Subsequent events, however, may still be part of the one hostile work environment claim and a charge may be filed at a later date and still encompass the whole.
>
> It is precisely because the entire hostile work environment encompasses a single unlawful employment practice that we do not hold, as have some of the Circuits, that [a] plaintiff may not base a suit on individual acts that occurred outside the statute of limitations . . . . Given, therefore, that the

14

> incidents constituting a hostile work environment are part of one unlawful
> employment practice, the employer may be liable for all acts that are part
> of this single claim. In order for the charge to be timely, the employee
> need only file a charge within 180 or 300 days of any act that is part of the
> hostile work environment.

*Id.* at 117-18 (internal citations and footnote omitted).

### 1. Count I - Hostile Work Environment Claim Is Time-Barred

Plaintiff's hostile work environment claim is based almost exclusively on her

allegations that Sgt. Osantowski: (a) treated her differently because of her gender, and

(b) subjected her to harassment of a sexual nature, which included making comments

about her body, repeatedly suggesting that she should have sex with him, degrading

women generally, calling women "bitches," making disparaging comments about women

in front of subordinate officers, and allowing subordinate officers to do the same.  It is

undisputed, however, that every allegation involving Sgt. Osantowski occurred before

May 11, 2011, the day he was transferred out of the Narcotics Unit. Sgt. Osantowski's

conduct, as alleged by Plaintiff, ceased more than three months before August 19,

2011.  Thus, any allegations *vis a vis* Sgt. Osantowski, standing alone, are time-barred

under 42 U.S.C. § 2000e-5(e)(1).  In other words, unless Plaintiff can show that Wayne

County, acting through the Sheriff's Department, "engaged in enough activity to make

out an actionable hostile environment claim," such that Sgt. Osantowski's alleged

incidents of sexual harassment were "part of one hostile work environment claim" that

continued beyond August 19, 2011, her hostile work environment claim must be

dismissed. *Morgan*, 536 U.S. at 118.

Plaintiff offers little argument and no evidence to support a continuing violations doctrine argument or a theory that any post-August 19, 2011 conduct related to the alleged conduct of Sgt. Osantowski.  As it relates to the period between August 19, 2011 and June 14, 2012, Plaintiff offers only the following statements in an affidavit attached to her response brief:

> 3.    I was subject to continued sexual harassment and a hostile work environment based on sex before and after Sgt. Osantowski was transferred and Theodis Sims was named to head "Team Polo".
>
> 4.    Almost daily, throughout the period of my active duty which ended on October 5, 2012, male officers in my presence referred to women as "bitches", "hoes", and "cunts", would comment on women's bodies, their desire to have sex with women, various females' capacity "to suck dick", and discuss their sexual conquests.  Sometimes, these comments were made in the presence of superior officers.

(Dkt # 27-18, Pg Id 1674.)  Significantly, Plaintiff does not: (a) offer evidence that any other officer or Department employee treated her, at any time, any differently than any other Department employee, singled her out because she was a woman, or made statements or suggestions of a sexual nature to her, (b) suggest how the conduct "identified" in her affidavit was part of the same "unlawful employment practice" allegedly perpetrated by Sgt. Osantowski, or (c) cite to any deposition testimony of herself or others that would support those statements.[3]  Moreover, Plaintiff offers no

---

[3]At her deposition, Plaintiff testified that:

> They [Officers Xenos and Lilly] referred to women as bitches all the time. That was just common. They always talked about if we were out in the street, if they saw something that they thought was attractive, "Yeah, fuck her. That's that bitch.  You see that, man," blah, blah, blah, and it became a situation where it was kind of like the pot calling the kettle black where Osantowski had to tell them, "Be careful because you already had a

16

evidence that she complained to anyone about any acts and comments by persons other than Sgt. Osantowski that she now argues constituted sexual harassment and created a hostile work environment during that period. There is no evidence that, between August 11, 2011, and June 14, 2012, any of the Defendants were aware of any such harassing conduct.

For these reasons, the court is not persuaded that the conclusory statements offered by Plaintiff in her recent affidavit constitute evidence sufficient to demonstrate that an unlawful employment practice continued after the transfer of Sgt. Osantowski. Plaintiff has failed to satisfy her burden of demonstrating that the continuing violations doctrine applies in this case.  Accordingly, Plaintiff's hostile work environment claim set forth in Count I of her First Amended Complaint is time-barred and must be dismissed.

### 2.  Count II - Title VII Retaliation Claims Are Not Time-Barred

Unlike Plaintiff's hostile work environment claim, which is based almost exclusively on alleged sexual harassment by Sgt. Osantowski, Plaintiff's retaliation claims in Count II involve alleged retaliatory acts by Deputy Chief Richardson and Sgt. Osantowski.  Moreover, whereas the acts Plaintiff relies on as the basis for her hostile work environment claim essentially ceased by May 11, 2011, the retaliatory acts that

---

situation with a sexual harassment complaint. Be careful what you say." So he knew that they were getting out of line, but it never stopped him to restraining himself. There were times when we were doing surveillance on an after-hours and Lilly is on the phone talking to some girl about his sexual fetishes.

(Dkt # 27-2, Pg Id 639.)  Plaintiff did not cite this testimony in her brief, however, perhaps because the incidents Plaintiff referenced here must have occurred before May 11, 2011, as Sgt. Osantowski was still assigned to the Narcotics Unit. *Id.*

17

form the basis of her Title VII retaliation claim allegedly: (1) began as early as August 2010 and continued to May 2011, as it relates to Sgt. Osantowski, and (2) began as early as January 2011 and continued through the time she was transferred to the Wayne County jail in October 2012, as it relates to Deputy Chief Richardson. Significantly, Plaintiff has alleged that all of the retaliatory acts are tied to complaints Plaintiff made to Sgt. Osantowski, Capt. George, and Deputy Chief Richardson that Sgt. Osantowski was sexually harassing her.  In addition, as Defendants acknowledge, Plaintiff's allegations against Deputy Chief Richardson regarding alleged missed overtime and training opportunities that occurred after August 19, 2011, and Plaintiff's transfer to the Wayne County jail (that occurred less than 60 days prior to the date Plaintiff filed her second complaint with the MDOC/EEOC regarding that transfer) are not time-barred.

### B. Title VII Retaliation

Defendants claim Plaintiff's retaliation claim must fail as a matter of law, as there is no evidence that Defendants retaliated against Plaintiff in violation of Title VII. To establish a prima facie case of Title VII retaliation, a plaintiff must prove:

> (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, *or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor*; and (4) there was a causal connection between the protected activity and the adverse employment action *or harassment*.

*Morris v. Oldham Cnty., Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000) (emphasis in original). If a plaintiff can prove a prima facie case, the employer may then show that there was a legitimate, nondiscriminatory reason for its actions. *Id.* at 792-93. A plaintiff

18

must then "demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for [retaliation]." *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003). "To demonstrate pretext at the summary judgment stage, the plaintiff must show by a preponderance of the evidence either (1) that the employer's proffered reasons for the adverse employment action had no basis in fact, (2) that the proffered reasons were not the true reason, or (3) that they were insufficient to motivate discharge." *Rhoades v. Standard Parking Corp.*, 559 Fed.App'x 500, 502 (6th Cir. 2014) (citing *Wexler v. Shite's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003); *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), abrogated on other grounds by *Gross v. FBL Fin. Servs.*, 557 U.S. 167 (2009), as recognized in *Geiger v. Tower Auto.*, 579 F.3d 614, 621 (6th Cir. 2009)).

The Supreme Court has summarized the "antiretaliation" provision as requiring that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal citations omitted). The Supreme Court noted that this is an objective standard based on the "perspective of a reasonable person in the plaintiff's position." *Id.* at 69-70. Finally, the Sixth Circuit has found that "[t]he burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

19

For the purpose of the instant motion, Defendants agree that Plaintiff satisfies the first two requirements for establishing a prima facie Title VII retaliation claim.  As to the first requirement, it is undisputed that: (a) in 2010 and 2011, Plaintiff complained to Capt. George and Deputy Chief Richardson that Sgt. Osantowski was sexually harassing her, (b) in May 2011, Plaintiff complained to IA regarding Sgt. Osantowski's alleged sexual harassment, and (c) on June 14, 2012, Plaintiff filed a Charge of Discrimination with the MDCR/EEOC regarding Sgt. Osantowski's alleged sexual harassment.  The second requirement is met because it is undisputed that Defendants were aware that Plaintiff engaged in each of those three protected activities.

Defendants argue that there is no proof that Plaintiff suffered an adverse employment action or that there is any casual connection between Plaintiff's protected activity and an adverse action. Specifically, Defendants assert that Plaintiff provides no proof that she was deprived of any overtime and training opportunities by Defendants. Defendants assert Plaintiff admitted to Undersheriff Pfannes that the overtime issue was "resolved."  (*See* Dkt # 25-8, Pg Id 370.)  Further, Defendants assert that Plaintiff was transferred from the Narcotics Unit to the Wayne County jail for "budgetary reasons," not as a result of any action Plaintiff took to complain about perceived harassment. Defendants also contend that Plaintiff has failed to demonstrate that Defendants' stated reason for her transfer, *i.e.,* budgetary reasons, was pretextual.  The court cannot agree with Defendants.

The evidence on the record allows for a finding that Plaintiff suffered adverse employment actions subsequent to the time she made complaints of sexual harassment

by Sgt. Osantowski.  Plaintiff has offered evidence that she was frozen out of meetings, not provided back-up from fellow officers on raids, denied opportunities for advanced training sessions, stripped of her Blackberry (even though co-workers got to keep theirs), and was deprived comp time and overtime.  Plaintiff also was ultimately transferred from her position in the Narcotics Unit to the Wayne County jail.  All of the foregoing incidents could constitute adverse employment actions and/or harassment.

Plaintiff also has "proffer[ed] evidence sufficient to raise the inference that [her] activity was likely the reason for the adverse action," *i.e.*, that there is a causal connection between her protected activity and the adverse employment action she suffered. *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (internal citations and quotation marks omitted).

> Retaliation may be inferred from "temporal proximity" if "an adverse employment action occurs very close in time after an employer learns of the protected activity." *Mickey v. Zeidler Tool & Die, Co.*, 516 F.3d 516, 525 (6th Cir. 2008). "But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Ibid.*

*Alexander v. Ohio State Univ. College of Soc. Work*, 429 Fed.App'x 481, 490 (6th Cir. 2011).  The Sixth Circuit has held that an inference of retaliation may be established based on temporal proximity of two or three months. *See Sanford v. Main St. Baptist Chruch Manor, Inc.*, 327 Fed.App'x 587, 600-01 (6th Cir. 2009) (two months); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 556 (6th Cir. 2004) (three months).

In this case, some of the alleged retaliatory acts (being frozen out of meetings, not being provided back-up on raids, not being able to attend advanced training

21

sessions, being stripped of her Blackberry, and being deprived of comp time and overtime) occurred within two or three months of Plaintiff's complaints to Capt. George and Deputy Chief Richardson and/or filing her complaint with IA, but her transfer from the Narcotics Unit to the Wayne County jail occurred approximately four months after she filed her Charge of Discrimination with the MDCR/EEOC and nearly 17 months after she filed her complaint with IA.  The court need not decide whether temporal proximity alone establishes an inference of retaliation in this case, however, because the record contains other evidence that allows a factfinder to infer a causal connection between the protected activity and the retaliatory conduct.

First, although Plaintiff complained to Capt. George and Deputy Chief Richardson that she was being sexually harassed by Sgt. Osantowski, neither Capt. George nor Deputy Chief Richardson did anything to help curb Sgt. Osantowski's behavior. Second, Plaintiff provides evidence that Deputy Chief Richardson attempted to persuade her not to file official charges, including repeatedly warning her that filing a formal complaint would result in her removal from the Narcotics Unit.  Third, there is evidence that, although the overtime issue was resolved as it related to Sgt. Osantowski, Plaintiff continued to be denied overtime opportunities by Deputy Chief Richardson after Sgt. Osantowski was transferred to the Wayne County jail on May 11, 2011.  Fourth, Plaintiff testified that she was otherwise treated differently from other officers after Plaintiff filed her IA complaint, as discussed above. (*See* Dkt # 27-14, Pg Id 1506-11.)  Fifth, Undersheriff Pfannes found during his investigation that "Capt. George provided a number of untruthful answers to questions" relating to Plaintiff's

complaints of sexual harassment. (Dkt # 27-17, Pg Id 1597).  Sixth, all of the individual Defendants were suspended for some period of time in or about August/September 2011 as a result of the IA investigation.  Seventh, both Plaintiff and Sgt. Karpuk testified as to Deputy Chief Richardson's vindictiveness.

The conduct and events described above, taken together with the temporal proximity of Plaintiff's protected activities to the alleged retaliatory conduct of Defendants, are sufficient to establish a causal connection between the protected activity and the adverse employment action or harassment against Plaintiff.  Further, based on the evidence in the record, a reasonable jury could find that "a reasonable person in the plaintiff's position" would have been dissuaded from making a charge of discrimination.  Plaintiff has established a prima facie case of retaliation.

It is also true that Defendants have offered a legitimate reason for transferring Plaintiff to the Wayne County jail, *i.e.*, budgetary restrictions, and evidence that Plaintiff was not the only officer from the Narcotics Unit who was transferred to the Wayne County jail in October 2012.  As Defendants deny that Plaintiff was frozen out of meetings, was not provided back-up on raids, was denied advanced training opportunities, was unilaterally stripped of her Blackberry, or was deprived comp time and overtime, Defendants do not offer a legitimate reason for any of those alleged retaliatory acts.

Plaintiff has offered sufficient evidence to show that a jury could determine, by a preponderance of the evidence, that Defendants' stated reason for the transfer was mere pretext, and that budgetary restrictions did not actually motivate the Defendants'

23

decision.  First, Deputy Chief Richardson's "warnings" that Plaintiff would be transferred from the Narcotics Unit if she filed a formal complaint of sexual harassment, together with evidence that he was a vindictive man, constitute evidence that there may have been other motivation for her transfer. Second, it is true that many officers in the Narcotics Unit were transferred out of the Narcotics Unit to the Wayne County jail in October 2012, but not all officers in the Narcotics Unit were transferred. Third, although Deputy Chief Richardson asserts that the basis for transferring an officer from the Narcotics Unit to the Wayne County jail was the officer's salary and/or the fact that the officer was a member of the command staff, Plaintiff was not a member of the command staff and Deputy Chief Richardson couldn't recall "how she got on that particular list" of officers to transfer.

A genuine dispute of material fact exists as to whether Defendants' actions were retaliatory in violation of Title VII. The court therefore must deny Defendants' motion for summary judgment on Plaintiff's Title VII retaliation claim.

### C.  Plaintiff's First Amendment Claim

The Sixth Circuit has established that:

> In free-speech retaliation cases arising in the employment context, we ask three questions: Was the individual involved in "constitutionally protected" activity—here activity protected by the free speech clause of the First Amendment? *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Would the employer's conduct discourage individuals of "ordinary firmness" from continuing to do what they were doing? *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir.1998); *see  Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.1982). Was the employee's exercise of constitutionally protected rights "a motivating factor" behind the employer's conduct? *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. 568. The claimant must win each point to prevail.

24

*Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 337-38 (6th Cir. 2010).[4]

### 1. "Constitutionally Protected" Activity

With respect to whether a public employee's speech constitutes "constitutionally protected" activity, the *Evans-Marshall* court clarified:

> The first question requires some elaboration. Three Supreme Court cases define the contours of the free-speech rights of public employees.
>
> [1]    *The "matters of public concern" requirement*. The First Amendment protects the speech of employees only when it involves "matters of public concern." *Connick v. Myers*, 461 U.S. 138, 143, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). In *Connick*, . . . the Court explained that not all employee speech is protected, only speech that "fairly [may be] considered as relating to" issues "of political, social, or other concern to the community." *Id.* at 146, 103 S.Ct. 1684. When, by contrast, an employee's speech does not relate to a matter of public concern, public officials enjoy "wide latitude" in responding to it without "intrusive oversight by the judiciary in the name of the First Amendment." *Id.*
>
> [2]    *The "balancing" requirement*. If the employee establishes that her speech touches "matters of public concern," a balancing test determines whether the employee or the employer wins. *See Pickering*, 391 U.S. at 568, 88 S.Ct. 1731. . . . In resolving the claim, the Court "balance[d] ... the interests of the teacher, as a citizen, in commenting on matters of public concern" against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. 1731. . . .
>
> * * * * *
>
> [3]    *The "pursuant to" requirement*. In the last case in the trilogy, a prosecutor reviewed a private complaint that a police officer's affidavit used to obtain a search warrant contained several misrepresentations. *Garcetti* [*v. Ceballos*], 547 U.S. [410,] 413–14 [2006]. . . . In rejecting [the public employee's] free-speech claim, the Court did not deny that the prosecutor's speech related to a matter of "public concern" under *Connick*, and it did not take on the lower court's reasoning that *Pickering* balancing

---

[4]*Evans-Marshall* was not discussed, or even mentioned, by the parties in their briefs.

favored the employee. It instead concluded that the First Amendment did not apply. "The controlling factor," the Court reasoned, "is that his expressions were made pursuant to his duties as a calendar deputy," making the relevant speaker the government entity, not the individual. *Id.* at 421, 126 S.Ct. 1951 (emphasis added). "We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.*

* * * * *

A First Amendment claimant must satisfy each of these requirements: the *Connick* "matter of public concern" requirement, the *Pickering* "balancing" requirement and the *Garcetti* "pursuant to" requirement.

*Evans-Marshall*, 624 F.3d at 337-38.

"The inquiry into the protected status of speech is one of law, not fact." *Connick*, 461 U.S. at 148 n.7. *See also id.* at 150 n.10.

### a. The *Connick* "Matter of Public Concern" Requirement

"Whether the speech at issue involves a matter of public concern is a question of law for the court[.]" *Bonnell v. Lorenzo*, 241 F.3d 800, 809-10 (6th Cir.), *cert. denied*, 534 U.S. 951 (2001). *See also Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 543 (6th Cir. 2012) (citing *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 180 (6th Cir. 2008) ("Whether or not a plaintiff's speech touches on a matter of public concern is a question of law.").[5]  In *Connick*, the Supreme Court stated that when considering whether an expression is made as a citizen upon a matter of political,

---

[5]"[T]here may be some factual questions for a jury if it is disputed whether the expression occurred or what words were specifically stated." *Farhat v. Jopke*, 370 F.3d 580, 589 (6th Cir. 2004) (citing *Waters v. Churchill*, 511 U.S. 661 (1994)).  In this case, there is no dispute that Plaintiff's expressions occurred or what words were expressed.

social, or other concern to the community or as an employee upon matters of personal

interest, a court must determine:

> Whether an employee's speech addresses a matter of public concern . . .
> by the content, form, and context of a given statement, as revealed by the
> whole record.

*Id.* at 147-48 (footnote omitted).

Defendants assert that Plaintiff's complaints of sexual harassment did not

constitute speech made as a matter of public concern but instead speech made "only as

an employee to her supervisors regarding her own personal workplace grievances."

Defendants also assert that, because Plaintiff's sexual harassment complaints were

made only internally and addressed only her individual workplace environment, she was

not speaking about a matter of public concern.  Plaintiff counters that, in the Sixth

Circuit, "it is well-settled that allegations of sexual harassment, like allegations of racial

harassment, are matters of public concern" and are therefore protected speech.

*Bonnell*, 241 F.3d at 812 (citing *Connick v. Myers,* 461 U.S. 138, 146 (1983)).

Plaintiff argues that her complaints regarding Sgt. Osantowski should be viewed

as "mixed speech," *i.e.*, the complaints involve both personal and public matters. *See,*

*e.g., Bonnell,* 241 F.3d at 812 (citations omitted) (recognizing that the First Amendment

protects speech involving "mixed questions of private and public concern, where the

employee is speaking both as a citizen as well as an employee, can be protected.");

*Perry v. McGinnis*, 209 F.3d 597, 606 (6th Cir. 2000) ("Because Perry's speech served

to ensure that the [state agency] was operating in accordance with the law . . . , it

concerns the most public of matters."). *See also Farmer v. Cleveland Public Power*, 295

F.3d 593, 601 (6th Cir. 2002) ("Farmer's complaint about her failure to be promoted . . .

constitutes a matter of personal interest. But her allegation that the Commissioners

were violating the Cleveland charter with an intent to deny African American female

employees the opportunities for promotions, if true, arguably could affect many other

employees and therefore touch upon matters of public concern" (citing *Bonnell*, 241

F.3d at 812)).  As discussed below, the motivation for Plaintiff's speech generally

appears to have been her interest in her personal employment situation, yet the content

of her speech was sexual harassment, which has been recognized as inherently a

public concern. This case qualifies as one of "mixed speech." *See Bonnell*, 241 F.3d at

812.

### i. Content of Plaintiff's Speech

In assessing whether the content of a public employee's speech constitutes a

matter of public concern:

> The relevant analysis . . . is whether the communication touches "upon
> matters *only* of personal interest...." *Connick*, 461 U.S. at 147, 103 S.Ct.
> 1684 (emphasis added).  A public concern/private interest analysis does
> not require that a communication be utterly bereft of private observations
> or even expressions of private interest. *See, e.g., Perry v. McGinnis*, 209
> F.3d 597 (6th Cir. 2000) (holding that an employee was speaking on a
> matter of public concern even when airing a personal grievance about
> racial discrimination).

*Mosholder v. Barnhardt*, 679 F.3d 443, 450-51 (6th Cir. 2012).  In addition, what the

public employee said matters, not why he or she said it. *See, e.g., id* at 450 ("[T]he

pertinent question is not *why* the employee spoke, but *what* he said...." (citing *Farhat v.

Jopke*, 370 F.3d 580, 591 (6th Cir. 2004)(emphasis in original))*; Nair v. Oakland Cty.

Cmty. Mental Health Auth.*, 443 F.3d 469, 479-80 (6th Cir. 2006) (same). *See also*

*Housey v. Macomb Cnty.*, 534 Fed.App'x 316, 321 (6th Cir. 2013) ("The 'pertinent question is not *why*' he spoke, 'but what he said.' . . . And what he said reflected a subject matter that transcended the bounds of run-of-the-mill employee beef.  Housey's speech thus passes the *Connick* matter-of-public-concern test.") (citation omitted) (emphasis in original)).

Further, whether the speech is made public or is communicated privately within the relevant public body is not determinative.  *See Perry*, 209 F.3d at 608 (a single internal grievance may constitute speech that is inherently, and is as a matter of law, a public concern); *Chappel v. Montgomery Cty. Fire Protection*, 131 F.3d 564, 579 (6th Cir. 1997) ("Constitutional protection for speech on matters of public concern is not premised on the communication of that speech to the public"); *see also Givhan v. Western Line Cons. Sch. Distr.*, 439 U.S. 410, 415-16 (1979) (plaintiff's "right to protest racial discrimination . . . [wa]s not forfeited by her choice of a private forum" (*i.e.*, communicating privately to her employer rather than expressing her views publicly), as "[n]either the [First] Amendment itself nor our decisions indicate that [freedom of speech] is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public.").

In *Perry*, the Sixth Circuit looked solely at the substantive nature of the employee's activity.  The plaintiff employee's statements were in the form of an internal grievance complaining that he was discriminated against on the basis of his race, but there were no allegations of a discriminatory policy or custom that affected other employees.  *Id.*  The defendant prison officials in *Perry* raised many of the same

29

arguments set forth by the Defendants in this case, namely that, "if an employee is not speaking out as a citizen, but is instead advancing his own personal employment dispute, that employee's complaint may not be deemed a matter of public concern." *Perry*, 209 F.3d at 608.  The *Perry* court explicitly rejected that argument in the context of race discrimination, stating:

> In *Chappel*, this Court plainly states that "[t]he fundamental distinction recognized in *Connick* is the distinction between matters of public concern and matters only of personal interest, not civic-minded motives and self-serving motives." *Chappel*, 131 F.3d at 575.  Thus, whether Perry's racial discrimination complaint was borne of civic-minded motives or of an individual employment concern is irrelevant.  **What is relevant is that the subject of Perry's complaint was racial discrimination—a matter inherently of public concern, according to the Supreme Court**. *See Connick*, 461 U.S. at 148 n.8, 103 S.Ct. 1684.

> We find that Perry's complaint of racially disparate treatment, which consisted of an internal grievance, is a matter of public concern, and as such, we remand the issue to the district court for further consideration in line with this opinion.

*Perry*, 209 F.3d at 608-09 (emphasis added).

The next year, the Sixth Circuit made clear that race discrimination was not the only form of discrimination inherently a matter of public concern for purposes of First Amendment analysis.

> [I]t is well-settled that allegations of sexual harassment, like allegations of racial harassment, are matters of public concern. *See Connick*, 461 U.S. at 146, 103 S.Ct. 1684 (noting that "it is clear that ... statements concerning the school district's allegedly racially discriminatory policies involved a matter of public concern") (citing *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415–16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979)); *Wilson v. UT Health Ctr.*, 973 F.2d 1263, 1269 (5th Cir.1992) (finding that "reports of sexual harassment perpetrated on [the plaintiff] and other women at [the University of Texas Health Center]—is of great public concern"); *see also  Perry v. McGinnis*, 209 F.3d 597, 608 (6th Cir.2000) (finding that because the plaintiff's complaint was for race discrimination, it

inherently involved a matter of public concern). . . . the fact that the
complaint related to sexual harassment . . . therefore involves a matter of
public import.

*Bonnell*, 241 F.3d at 812-13.  Later in 2001, in *Warren v. Ohio Dept. of Public Safety*, 24

Fed. App'x 259, 267-68 (6th Cir. 2001), the Sixth Circuit concluded:

Allegations of racial and sexual discrimination are inherently matters of
public concern even if they are tied to personal employment disputes.
*See, Connick*, 461 U.S. at 148 n. 8 (allegations of racial discrimination by
a public employer are a "matter inherently of public concern[,]" discussing
*Givhan*, 439 U.S. at 415-16); *Strouss v. Mich. Dept. of Corr.*, 250 F.3d
336, 346 n. 5 (6th Cir.2001) (sexual harassment is a matter of public
concern); *Boger*, 950 F.2d at 322 (response to reporter's question about
racial discrimination addressed matter of public concern); *Matulin v. Vill. of
Lodi*, 862 F.2d 609, 612-13 (6th Cir.1988) (sexual and handicap
discrimination in the workplace are matters of public concern). Whether
the motive behind complaining of discrimination is civic mindedness or an
individual employee concern is not relevant. What is relevant is the subject
of the complaint, discrimination, which is a matter "inherently of public
concern." *Perry v. McGinnis*, 209 F.3d 597, 608 (6th Cir.2000).

*See also Ebelt v. Cty. of Ogemaw*, 231 F.Supp.2d 563, 572 (E.D. Mich. 2002) (Lawson,

J.) (citing *Bonnell*, 241 F.3d at 812) ("Sexual harassment itself is inherently a matter of

public concern, regardless of its context").

It is undisputed that the speech at issue in this case involves Plaintiff's

complaints to her superiors regarding Sgt. Osantowski's alleged sexual harassment of

Plaintiff.  Therefore, pursuant to *Connick* and existing Sixth Circuit precedent, the fact

that Plaintiff complained of sexual harassment necessitates a finding that the content of

Plaintiff's statement involved a matter of public concern.

## ii. Context and Form of Plaintiff's Speech

Although the Sixth Circuit decided *Perry* well after *Connick*, the *Perry* majority did not engage in, nor mention the need to conduct, an assessment of the "form[] and context of the [employee's] statement, as revealed by the whole record," as dictated by *Connick*.[6] Based on Sixth Circuit case law since *Perry*, however, the court finds that the context and form of a plaintiff's speech <u>are</u> relevant, even in cases where the content of the speech involves a matter inherently of public concern. Most notably, only one year after *Perry* was decided, following a determination that the subject (content) of the plaintiff's speech involved a matter of public concern, the *Bonnell* court expressly concluded that "[t]he context and form of Plaintiff's speech . . . require further inquiry." *Bonnell*, 241 F.3d at 813. Accordingly, the court shall assess whether the context and form of Plaintiff's speech support a finding that her speech was a matter of public concern.

In *Bonnell*, the plaintiff's speech regarding a sexual harassment complaint filed against him was not made solely within his governmental unit. He also circulated his speech to the faculty and students at the community college where he taught — and to

---

[6] In fact, as the *Perry* dissent expressly stated that it believed the court needed to conduct an assessment of "the content, form, and context of the statement, as revealed by the whole record," the *Perry* majority's failure to conduct an analysis of the form and context means that *Perry* could be read as not requiring an analysis of the form and context of the statement, at least when race discrimination (or possibly a matter of inherent public concern) is alleged. *See Perry*, 209 F.3d at 611 (Norris, J., dissenting). As discussed above, allegations of sexual harassment, like allegations of race discrimination, are inherently of public concern. Therefore, as Plaintiff implicitly does by failing to mention or offer any argument regarding the context or form of her speech, one could argue that the court need not engage in an analysis of the context and form of Plaintiff's speech. Under that interpretation, the court would be constrained to conclude that Plaintiff's complaints involve a matter of public concern—without any consideration of the "form[] and context of a given statement, as revealed by the whole record." *See Connick*, 461 U.S. at 147-48.

32

the media, all of whom the court determined "certainly would be interested in learning the nature of." *Id.* at 813.  The *Bonnell* court thus found that the context and form of the plaintiff's expressions regarding the issue of sexual harassment also supported a finding that the plaintiff's speech was of a matter of public concern. *Id.*

In this case, it is undisputed that all of Plaintiff's expressions were in the form and context of internal grievances made up the chain of command.  In other words, the speech at issue was made only within the Wayne County Sheriff's Department and only to persons whom Plaintiff reported in the normal course of her duties.  Even when she felt her supervisors did not adequately address her concerns, she sought out and complained of the sexual harassment to IA.  As such, unlike in *Bonnell* and many other cases, Plaintiff's complaints were not expressed outside the chain of command or the Wayne County Sheriff's Department.  Likewise, Plaintiff did not contact or complain to the media or any other governmental agency.  Therefore, neither members of the general public nor the media were aware of her expressions.  In addition, as evidenced by Plaintiff's own statements in pursuing this action (including those in her complaint, at her deposition, and in her response brief), Plaintiff's speech appears to have motivated primarily, if not exclusively, by concerns about her individual employment situation.  For example, Plaintiff testified:

> I wanted Osantowski to get off of me, to get him to leave me alone.  I wanted to be able to do my job.  I was concerned about my physical safety and it seemed like Richardson did not particularly care because he wanted this man in place to do what he wanted to do regardless of what I had to say.

(Dkt # 27, Pg Id 570 n.11; Dkt # 27-2, Pg Id 643.)

33

On the other hand, Plaintiff and other officers testified that she was not the only female employee in the Narcotics Unit (and/or the Morality Unit) allegedly subjected to the same or similar conduct by Sgt. Osantowski, including one other female officer who testified that Sgt. Osantowski engaged in conduct toward her that was similar to the conduct about which Plaintiff complains, *e.g.*, Osantowski asked her out and made sexually suggestive comments to her. Plaintiff's speech did not pertain to the operation or administration of the Wayne County Sheriff's Department.  Rather, her complaints of sexual harassment involved "a matter of public import," *Bonnell*, 241 F.3d at 813.  As such, the court concludes that Plaintiff's complaints were not "run-of-the-mill employee beefs," *Housey*, 534 Fed.App'x at 321, or "the quintessential employee brief: [that] management . . . acted incompetently." *Haynes v. City of Circleville*, 474 F.3d 357, 365 (6th Cir. 2007) (citation omitted).

For the reasons set forth above, the court finds that while the form and context of Plaintiff's speech do not weigh heavily in favor of concluding that she was acting as a citizen when she filed her internal grievances of sexual harassment, the form and context of her speech also do not weigh heavily in favor of concluding that she was acting as an employee when doing so.

### iii.  Conclusion

The facts of this case most closely parallel one Sixth Circuit case, *i.e.*, *Perry*.  As discussed above, the *Perry* court did not conduct an analysis of the context and form of the speech at issue.  Nonetheless, it concluded that a plaintiff's complaint of race discrimination was not subject to dismissal on summary judgment, even though it was a

34

self-serving complaint in the form and context of an internal grievance, because the complaint of race discrimination was a matter of inherent public concern. *Perry*, 209 F.3d at 608-09. Likewise, the subject matter (content) of Plaintiff's complaints, *i.e.*, sexual harassment, constitutes a matter of inherent public concern. Moreover, as discussed above, even if Defendants are correct in arguing that Plaintiff's motive was to resolve her "individual employee concern" rather than civic mindedness, her motive was not dispositive or even relevant. *See Warren*, Fed.App'x at 267-68; *Perry*, 209 F.3d at 608-09; *Chappel*, 131 F.3d at 579.

Therefore, the court concludes that Plaintiff has produced sufficient evidence to satisfy the *Connick* "matters of public concern" prong required by *Evans-Marshall*.

### b. The *Pickering* "Balancing" Requirement

As the court has determined that Plaintiff's speech was a matter of public concern, the court next turns to the *Pickering* "balancing" test. "At this stage, the burden is on [Defendants] to proffer legitimate grounds for the allegedly retaliatory action at issue." *Handy-Clay*, 695 F.3d at 544, citing *Hughes*, 542 F.3d at 180 (citing *Rodgers*, 344 F.3d at 601).

> When balancing the public employer's interest in efficient operations against the employee's speech interest as required by *Pickering*, the court considers whether "an employee's comments meaningfully interfere with the performance of her duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." *Williams v. Com. of Ky.*, 24 F.3d 1526, 1536 (6th Cir. 1994). The balancing test focuses "on the disruption resulting from the speech itself, not other events." *Ibid*.

35

*Schroeder v. City of Vassar*, 371 F.Supp.2d 882, 893 (E.D. Mich. 2005) (Lawson, J.). *See also Leary v. Daeschner*, 349 F.3d 888, 900 (6th Cir. 2003). "A valid complaint of sexual harassment will outweigh almost any governmental interest, legitimate though it may be otherwise." *Ebelt*, 231 F.Supp.2d at 572 (citing *Bonnell*, 241 F.3d at 812).

Defendants failed to address the *Pickering* "balancing" requirement in their discussion of Plaintiff's First Amendment claim. Defendants did argue in other sections of their motion and briefs that Plaintiff's transfer was the result of the termination of the Narcotics Unit. Defendants have not, however, argued that the interests of the individual Defendants and/or Defendant Wayne County in regulating Plaintiff's allegations of sexual harassment outweigh Plaintiff's interest in complaining about sexual harassment.

In this case, there is no evidence that Plaintiff's "comments meaningfully interfere[d] with the performance of her duties [or] undermine[d] a legitimate goal or mission of" Wayne County or the Wayne County Sheriff's Department. *Williams*, 24 F.3d at 1536. Plaintiff continued to perform her duties, and the complaints of alleged sexual harassment employer cannot be said to undermine any legitimate goal or mission of Wayne County or the Wayne County Sheriff's Department. To the contrary, Plaintiff's complaints were consistent with Wayne County's mission to have a harassment-free workplace. (Dkt # 25-4, Pg Id 326.) Although Plaintiff's complaints may have caused disharmony among co-workers, the complaints themselves did not "impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." *Williams*, 24 F.3d at 1536. In other words, there is no evidence that

36

Plaintiff's speech (*i.e.*, her complaints of alleged sexual harassment by Sgt. Osantowski), in itself, disrupted the operation of Wayne County or the Wayne County Sheriff's Department.

For the foregoing reasons, including the fact that Plaintiff had a legitimate interest in reporting sexual harassment by her supervisor, an employee of Wayne County, the court finds that the balancing of *Pickering* interests favors Plaintiff.

### c. The *Garcetti* "Pursuant to" Requirement

Defendants assert that, because Plaintiff was a police officer who was expected to know and uphold the law, her complaints of sexual harassment amounted to speech made "pursuant to" her duties as an employee, not speech made as a citizen.  As such, Defendants contend Plaintiff cannot satisfy the *Garcetti* prong of the *Evans-Marshall* test.  The court finds, however, that Defendants have not identified any reason the court should find that  "statements [were] made pursuant merely [sic] to her professional duties" when an officer reported that a supervisor sexually harassed her. *Handy-Clay,* 695 F.3d at 540 (citing *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 348 (6th Cir.), *cert. denied*, — U.S. —, 131 S.Ct. 643, 178 L.Ed.2d 478 (2010)).  Police officers address matters involving violations of civil or criminal codes.  The court is not familiar with, and Defendants have not cited, any authority to support the proposition that police officers are responsible for identifying or enforcing civil laws governing employment practices, such as alleged acts of discrimination in the workplace.  In the words of Plaintiff, her "job was to investigate crimes and, where appropriate, make arrests and assist in prosecutions—not to report on her supervisors' . . . repeated

37

violations of her civil rights."  Thus, the court concludes that Plaintiff's speech was not

made "pursuant to" her official duties.

Defendants rely on one recent Sixth Circuit case to argue that *Garcetti* requires

that a plaintiff show "her speech was made as a private citizen, rather than pursuant to

her official duties." *Handy-Clay*, 695 F.3d at 540.[7]  If the court were to analyze the

*Garcetti* prong pursuant to that interpretation, it would require the court to determine

whether the plaintiff spoke either "as a citizen" or as an employee "pursuant to" her

duties.  The court is not persuaded by Defendants' argument, and the court concludes

that the correct method of *Garcetti* analysis is limited to a determination of whether the

---

[7]       *Handy-Clay* was decided two years after *Evans-Marshall,* but the court did not
cite or rely on *Evans-Marshall* with respect to whether the employee was engaged in a
"constitutionally protected" activity.  The *Handy-Clay* court identified all of the following
as relevant when considering whether a plaintiff is acting pursuant to her duties:

> "the impetus for her speech, the setting of her speech, the speech's
> audience, and its general subject matter." *Weisbarth v. Geauga Park Dist.*,
> 499 F.3d 538, 546 (6th Cir. 2007).  Relevant considerations include
> whether the statements were made to individuals "up the chain of
> command," *Fox*, 605 F.3d at 350 (quoting *Davis v. McKinney*, 518 F.3d
> 304, 313 (5th Cir. 2008)), and whether the content of the speech is
> "nothing more than 'the quintessential employee beef: management has
> acted incompetently.'" *Haynes v. City of Circleville*, 474 F.3d 357, 365 (6th
> Cir. 2007) (quoting *Barnes v. McDowell*, 848 F.2d 725, 735 (6th Cir.
> 1988)). Factors that may be relevant but are not dispositive include
> whether the speech was made inside or outside of the workplace and
> whether it concerned the subject-matter of the speaker's employment. *See
> Garcetti*, 547 U.S. at 420, 126 S.Ct. 1951 ("Employees in some cases may
> receive First Amendment protection for expressions made at work.") *id.* at
> 421, 126 S.Ct. 1951 ("The First Amendment protects some expressions
> related to the speaker's job.").

*Handy-Clay*, 695 F.3d at 540-41. In the court's view, this analysis appears to be an
assessment of the form and context of the employee's activity.

speech was "pursuant to [the employee's] official duties."  As the Sixth Circuit noted in

discussing *Garcetti* in 2007, the two prongs of the traditional *Connick* analysis were that:

> [T]he employee (1) must have spoken "as a citizen," and (2) must have
> "address[ed] matters of public concern."(citing *McMurphy v. City of
> Flushing*, 802 F.2d 191, 197 (6th Cir. 1986) (holding that "when an
> employee speaks not as a citizen upon matters of public concern, but
> instead as an employee upon matters only of personal interest, absent
> the most unusual circumstances, a federal court is not the appropriate forum
> in which to review the wisdom of a personnel decision taken by a public
> agency allegedly in reaction to the employee's behavior").

*Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 542 (6th Cir. 2007).  The *Wiesbarth*

court then held:

> The Supreme Court clarified the first of these requirements in *Garcetti v.
> Ceballos*, 547 U.S. 410, 126 S.Ct. 1951, 1958, 164 L.Ed.2d 689 (2006), by
> holding that "when public employees make statements *pursuant to their
> official duties*, the employees are not speaking as citizens for First
> Amendment purposes."

*Weisbarth*, 499 F.3d at 542.  In other words, if the speech was made "pursuant to [the

employee's] official duties," then it could not have been made, by definition, "as a

citizen." *Id.*  But, this does not mean, as Defendants would like, that the mere fact the

speech was made by an employee (rather than as a citizen) would necessitate a finding

that the speech was "pursuant to [his or her] official duties."

Defendants also relied on a decision rendered in the Eastern District of Michigan.

*See Harrison v. Oakland Cty.*, 612 F.Supp.2d 848 (E.D. Mich. 2009) (Rosen, J.).  In

*Harrison*, the court cited *Garcetti* in stating that an employee's internal complaint to

supervisors about sexual harassment involved only workplace conditions and, as such,

did "not qualify as speech [made] 'as a citizen' that is entitled to First Amendment

protection." *Id.* at 867 (citations omitted).  Defendants' reliance on *Harrison* is

misplaced, however, because, unlike Plaintiff, the plaintiff in *Harrison* was the supervising officer of the alleged sexual harasser (another police officer). For that plaintiff supervising officer, reporting sexual harassment was among the specified duties he was expected to perform, *i.e.*, making such a report literally was "pursuant to [his] official duties." *Harrison*, 612 F.Supp.2d at 867.[8]

For the reasons set forth above, the court concludes that Plaintiff's complaints of sexual harassment were not made "pursuant to [her] official duties."

### d. Conclusion

For the reasons set forth above, the court finds that: (a) Plaintiff has satisfied the *Connick* "matter of public concern" requirement, (b) the *Pickering* "balancing" requirement favors Plaintiff, and (c) Plaintiff's speech was not made "pursuant to" her official duties, thus prevailing on the *Garcetti* requirement. Accordingly, the court finds that Plaintiff has satisfied the "constitutionally protected" activity prong of the *Evans-Marshall* test.

### 2. Employer's Conduct would Discourage Plaintiff's Speech

In their reply brief, Defendants address for the first time whether their actions would discourage Plaintiff's speech.[9] Even in their reply brief, however, Defendants

---

[8]The court also finds that *Harrison* decision unpersuasive because, despite sexual harassment being the subject of the speech at issue, the court neither mentioned or discussed *Bonnell* in holding that the speech at issue was not a "matter of public concern." Further, the *Harrison* court neither mentioned nor discussed *Perry*, even though: (1) the case involved "a private workplace grievance" that "addressed only a personal conflict between" the plaintiff and another police officer, and (2) the plaintiff's "objective in bringing the matter to the attention of a supervisor was 'that he wanted all the things [the other officer] had been saying to stop.'" *Id.* at 868.

[9]In their motion, Defendants only addressed Plaintiff's First Amendment claim in one sentence, with citations, and did so in the motion itself. Even that sentence, however,

40

simply stated that "Plaintiff fails to demonstrate that the Defendants' adverse action caused her to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity[.]" The court cannot agree. A reasonable factfinder could determine that: (a) denying a person overtime and training opportunities, (b) failing to provide her with back up on raids, and (c) transferring her from a position in the Narcotics Unit to a position at the Wayne County jail would likely chill a person of ordinary firmness from complaining of sexual harassment. Accordingly, the court concludes that Plaintiff has met her burden with respect to the second *Evans-Marshall* prong.

### 3. Plaintiff's Speech was "A Motivating Factor"

Again, Defendants address the issue of whether Plaintiff's speech was a motivating factor for the first time in their reply brief. Therein, Defendants simply stated that "Plaintiff fails to demonstrate . . . that the adverse action was motivated at least in part as a response to the exercise of her constitutional rights[.]" The court cannot agree. As discussed above, (1) Deputy Chief Richardson repeatedly stated that Plaintiff would be transferred if she filed a formal complaint, and (2) Plaintiff only began to lose overtime and training opportunities and experience the absence of back up for raids after she started complaining that Sgt. Osantowski was sexually harassing her. Based on that evidence, a reasonable factfinder could determine that Defendants: (a) denied her overtime and training opportunities, (b) failed to provide back up for her on raids,

---

only touched on the first *Evans-Marshall* prong (*i.e.*, whether her speech was a "matter of public concern"). Defendants did not set forth any argument regarding Plaintiff's First Amendment claim in their brief accompanying their motion.

and (c) transferred her from the Narcotics Unit to the Wayne County jail as a result of her complaints of sexual harassment.  Accordingly, the court concludes that Plaintiff has met her burden with respect to the third *Evans-Marshall* prong.

### 4.  Conclusion

For the reasons set forth above, the court concludes that: (a) as a matter of law, Plaintiff's speech was a matter of public concern, thus satisfying the first *Evans-Marshall* prong, and (b) there is sufficient evidence from which a reasonable jury could determine that Plaintiff could satisfy both of the remaining prongs *Evans-Marshall* established as necessary to prevail on a free-speech retaliation case arising in the employment context. *See Evans-Marshall*, 624 F.3d at 337-38.  Accordingly, Defendants' motion for summary judgment is denied with respect to Plaintiff's First Amendment claim.

### IV. CONCLUSION

Accordingly, for the reasons set forth above, IT IS ORDERED that Defendants' Motion for Summary Judgment (Dkt # 25) is GRANTED IN PART and DENIED IN PART.  Defendants' motion is GRANTED as to Count I of Plaintiff's First Amended Complaint and DENIED as Counts II and III of Plaintiff's First Amended Complaint.


　s/Robert H. Cleland　　　　　　　　　　
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE


Dated:  September 22, 2015

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, September 22, 2015, by electronic and/or ordinary mail.

 s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522